UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

RODNEY B. JONES                                   CIVIL ACTION NO. 06-cv-1282

VERSUS                                            JUDGE WALTER

RICHARD STALDER, ET AL                            MAGISTRATE JUDGE HORNSBY

## REPORT AND RECOMMENDATION

**Introduction**

Rodney Jones ("Plaintiff") is an inmate, now housed at the Dixon Correctional Institute, who filed this action based on events that allegedly happened when Plaintiff was housed at the David Wade Correctional Center.  Plaintiff alleges that David Wade officials maintained a policy of using vicious, unvaccinated feral cats as rodent control at the prison and that one of the cats attacked him.  Defendant Brian Tucker responded to the complaint with a motion that contended Plaintiff had not properly exhausted his administrative remedies against Tucker before suit was filed.  The other nine defendants joined in a motion to dismiss that invoked qualified immunity.  Both motions were denied.  See Docs. 47 and 50.

A few months later, and after discovery was conducted, Plaintiff filed a Motion for Summary Judgment (Doc. 76) and requested judgment in his favor.  Defendants did not file a formal opposition to that motion, but they did file their own Motion for Summary Judgment (Doc. 84).  Plaintiff then filed a memorandum in opposition.  Doc. 87.

**The Summary Judgment Record**

Defendants' motion is supported by affidavits and certified copies of medical records and other documents.  Plaintiff has also submitted copies of medical records, letters that he claims to have sent prison officials, discovery responses served by Defendants, and declarations made under penalty of perjury that may be competent summary judgment evidence under 28 U.S.C. § 1746.  See Hart v. Hairston, 343 F.3d 762, 764 n.1 (5th Cir. 2003).  A summary of the competing evidence is set forth below.

Plaintiff states that, during his time at David Wade, a colony of 15 to 20 feral cats roamed freely throughout the prison compound.  Three of the cats - T.C., Roy, and Kitty-Kitty - roamed freely in and about Plaintiff's N5 housing area.

Posted policy #34 prohibits an inmate from possessing or handling any snake, spider, insect, small rodent or animal.  Plaintiff declares that in 2003 Warden Michael and four other prison officials told him that posted policy #34 was implemented to protect inmates from animal-related injuries and that the policy did apply to stray cats. Despite this policy, Plaintiff declares, a small group of inmates were allowed to raise Kitty-Kitty from a kitten to an adult. The inmates fed the cat at least twice a day inside of Plaintiff's housing unit, bathed the cat approximately once a week, kept the cat overnight inside the housing unit, and generally played with and groomed the cat inside the housing unit.  Plaintiff states that the inmates were allowed to keep Kitty-Kitty and the other cats as pets because those inmates provided prison officials with gifts and/or inappropriate favors in the form of hobby-craft items.

Plaintiff declares that Kitty-Kitty clawed his left wrist in a 2004 "attack" that caused two lacerations and "significant bleeding."  Plaintiff adds that his left wrist is still visibly scarred.  Medical records and the testimony of a physician (submitted by Defendants) show that Plaintiff made the following statement in a written request for medical treatment dated July 6, 2004:  "I was clawed and/or bitten by the cat and when I jerked my hand away to minimize the attack my left elbow slammed against the wall."  The medical staff found a minor scratch on the left wrist and no swelling to the left elbow.  They cleaned the scratch, applied a Band-Aid, dispensed Tylenol, and placed Plaintiff on regular-duty status with restrictions for two days.  Medical records for the six-month period that followed contain no reference to Plaintiff being exposed to the risk of rabies, cat-scratch disease or toxoplasmosis as a result of this incident.[1]

Plaintiff declares that after the 2004 attack he "personally spoke with each and every one of the defendants" except Secretary Stalder and asked that the cat be removed from his housing unit.  Defendant Brian Tucker was "one of many officers who refused to remove the cats and generally ignored Plaintiff's requests.  Plaintiff did not personally speak to Secretary Stalder, but he did write him (the letter summarized below) about his concerns.

Plaintiff declares that Kitty-Kitty would excrete his bodily waste inside the housing unit, including the food-serving and dining areas, and the waste would remain on the floors

---

[1]Those three diseases are cited by Plaintiff as among the chief health risks of allowing cats in the prison compound.

and walls for several months at a time.  Plaintiff declares that he "personally informed" the several defendants about that ongoing situation, but the Defendants "did nothing" to remove the cat.  Plaintiff states that he has suffered bouts of extreme nausea and loss of appetite because of the stench of the cat's waste, and he says that he has suffered bouts of vomiting because several times when eating he has had to extract cat fur from his mouth.

In July 2004, Plaintiff wrote a letter to Warden Michael titled "Dangerous Situation." Plaintiff wrote that he had been attacked, a few days earlier, by Kitty-Kitty.  Plaintiff complained that the practice of allowing inmates to keep personal pets was inappropriate and dangerous.  Plaintiff stated his understanding that none of the cats had received vaccinations, and he expressed fear of contracting rabies.  Plaintiff said that he wrote hesitantly because he did not want the cats to be killed, but he asked that the cats be removed because of health and safety concerns.

On August 1, 2004, about two weeks after Plaintiff wrote Warden Michael, he penned a letter to Secretary Richard Stalder titled "Potentially Fatal Situation."  He described to Secretary Stalder how he was attacked by one of the cats that Warden Michael and her subordinates allegedly allowed certain inmates to keep as a pets.  Plaintiff wrote that Warden Michael had refused his request to remove the cats, and he asked for Secretary Stalder's intervention and enforcement of posted policy #34.  Plaintiff complained about the threat of rabies and that the cats excreted bodily fluids in the cellblock, including the dining area.

Plaintiff stated his love for animals but, because of his health and safety concerns, he asked Secretary Stalder to have the cats removed immediately.

The next year, in July 2005, Plaintiff wrote a letter to Deputy Warden Jerry Goodwin and again asked that the three cats be removed on the grounds that their presence created a "substantial risk to my health and safety." Plaintiff noted the prior attack by Kitty-Kitty and asked that the cats be removed immediately "before someone else is seriously injured."

None of the letters to Michael, Stalder or Goodwin actually described any injuries that resulted from the "attack" mentioned in the letters. Plaintiff's letters and complaints did not result in the removal of the cats.

Plaintiff declares that Kitty-Kitty struck again on March 25, 2006 when the cat clawed and bit at his right leg, which caused a laceration and "significant bleeding." Plaintiff adds that his right leg is still visibly scarred and that he has suffered bouts of anxiety, depression and nightmares because of the attack.

Prison physician Dr. Pam Hearn testifies that Plaintiff's request for medical treatment dated March 2006 made the following complaint:  "I accidentally stepped on a cat and he bit and scratch my leg causing me to twist my right knee and hurt my left elbow.  I also have a knot on my forehead from the fall."  The nurse who provided treatment recorded that Plaintiff had a "minute bump" to the middle of his forehead with no break in the skin. Plaintiff denied any loss of consciousness.  There was also a "superficial scratch" to the back of Plaintiff's right lower leg approximately five centimeters long.  There was no obvious

swelling to the right knee, and the range of movement for the knee was within normal limits. There were no skin breaks or obvious swelling to the left elbow, and the range of movement for the elbow was normal.  The medical treatment provided included cleaning the scratch on the leg, giving Plaintiff instructions to apply ice to the knee and elbow areas as needed during the next 24 hours, prescribing Tylenol, and placing Plaintiff on limited duty status for two days.  Plaintiff was told to return if his condition worsened.  Medical records for the time that followed contain no suggestion that Plaintiff was exposed to the risk of rabies, cat-scratch disease, or Toxoplasmosis as a result of this incident.

Plaintiff's declaration, under penalty of perjury, describes his injuries caused by the March 25, 2006 incident as being much more serious than reflected in the medical records. Plaintiff swears that his injuries include, but are not limited to (1) a left elbow injury that has caused great pain and partial disability for approximately two years, (2) a right knee injury that caused him to walk with a painful limp for approximately three weeks, (3) a laceration on the right leg that caused significant bleeding and pain for approximately eight days, and (4) a knot about the diameter of a nickel on the forehead that caused pain for approximately five days.  Plaintiff declares that he has received related medical treatment that includes approximately three months of "painful physical therapy," cortico-steroids injections, oral cortico steroids, an orthopedic brace, and oral pain medications.  Prison medical records do reflect that Plaintiff continued to complain of pain in his elbow and knee after March 25, 2006.

Plaintiff submits a declaration by fellow inmate Arlen Brown, who offers statements that generally corroborate Plaintiff's statements about the presence of Kitty-Kitty in the housing unit and that prison officials are well aware of the cat and its food and water dishes on the premises.  Brown adds that he has seen numerous prison officials, including Warden Michael and Deputy Warden Goodwin allow inmates to feed Kitty-Kitty both table scraps and what appeared to be commercial tuna fish and cat food.  Brown states that numerous prison officials have witnessed Kitty-Kitty excrete bodily waste in the dining room, and he states that he has seen Kitty-Kitty "attack and/or aggressively claw" six inmates, including Brown. Dr. Hearn testifies that she has reviewed Brown's medical records from 2001 through the 2006 date of Brown's declaration and found no indication that Brown reported to prison medical personnel that he was attacked by a cat or suffered an ailment as a result of an attack. Brown does not identify the other inmates that he swears he saw be attacked.

Dr. Hearn adds that at no time prior to the time of the claims asserted in Plaintiff's suit did she receive a health alert with regard to an outbreak of rabies, cat-scratch disease, or toxoplasmosis in the area surrounding the prison.  She states that she never had medical concerns with regard to a cat being on the premises jeopardizing the health or safety of inmates.

Plaintiff directed a request for admissions to Defendants that asked them to admit that all stray cats were removed from the north compound of the prison on approximately the same day this civil action was served on Defendants.  Defendants admitted that cats that were

seen on the north compound at that time were removed, and they responded to a related request by admitting that a gray wood and plexiglass structure was soon thereafter removed from the N5 exercise yard.  Plaintiff describes that structure as a "cat house" built by inmates for Kitty-Kitty.  Defendants admit that the structure was built by inmates "for a cat wandering onto the premises," but they deny that the action violated posted policy #34.

Plaintiff stated in his declaration attached to his memorandum in opposition that when he voiced concerns for safety he was told by Warden Michael and Deputy Warden Goodwin and other officials that the cats were used for rodent control pursuant to an unwritten policy that was authorized by Secretary Stalder and Warden Michael.  In her affidavit, Warden Michael states: "At no time has DWCC used cats for rodent control."  She explains that the prison is accredited by an association that requires the prison to have a contract with a pest control company.  Warden Michael attaches copies of the contracts for the most recent years. She also testifies that there is not a population of stray cats at David Wade, that cats are not permitted to freely roam in the dining or living areas, and that cats are not permitted to excrete bodily waste in the living or dining areas of the prison.  Warden Michael states that she has knowledge of a cat "occasionally wandering the surrounding area of the N5 protection unit," but she believed in March 2006 that "the cat was not causing any problems." She also testifies: "At no time prior to the filing of [Plaintiff's] lawsuit was affiant aware of any complaints lodged by inmates housed at DWCC concerning a cat that occasionally

wandered onto the premises." She also denies knowledge (in conflict with Plaintiff's letters) that any inmates have been attacked by a cat.

Warden Michael testifies that she issued posted policy #34 and, as warden, she is entitled to interpret it and determine violations. She testifies that at the time of the alleged incident in March 2006, she had determined that the occasionally feeding of the cat was not in violation of the policy. She denies that inmates were allowed to keep cats as personal pets, and she flatly denies Plaintiff's testimony that prison officials allowed that practice in exchange for gifts or favors. She testifies that, at no time prior to the filing of Plaintiff's lawsuit, did she have knowledge of a cat on the prison premises that jeopardized the health or safety of inmates.

Deputy Warden Jerry Goodwin offers an affidavit and testifies about how he handled the administrative grievance filed by Plaintiff. He also denies any knowledge of an inmate being attacked by a cat prior to the claims asserted in this lawsuit. Deputy Warden Goodwin's response to the grievance stated that he had received written correspondence from the officers named in the grievance, and each officer had adamantly denied any knowledge of Plaintiff reporting an attack by a cat on the date listed in the grievance. One officer reported that Plaintiff had said he tripped over a cat, and the medical reports also indicated that Plaintiff said he had tripped over a cat. Captain Benson reported to Goodwin that witnesses said that Plaintiff deliberately attempted to step on the tail of the cat in an effort to gain leverage in a request to be transferred from David Wade. Plaintiff told Captain

Benson that he would withdraw his grievance if he were granted a transfer, which supported those accounts.  Deputy Warden Goodwin, noting that the prison borders the Kisatchie National Forest, stated: "Non-feral stray cats have been tolerated at DWCC for over twenty years as a cost-effective method of rodent control without incident."  Goodwin determined that Plaintiff did not produce evidence of an actual attack and that he had merely tripped.  No administrative intervention was granted.  Plaintiff pursued the claim to Secretary Stalder's office, and Goodwin's decision was held to be satisfactory.

The remaining Defendants offer their own affidavits, each of which is substantially similar.  They each deny knowledge of a cat attacking an inmate housed at the prison.  They deny that they or other prison officials allowed inmates to possess cats as pets in exchange for inappropriate favors or gifts, and they deny knowledge that cats on the prison premises jeopardized the health or safety of inmates.  As mentioned above, Defendants also offer the affidavit of Dr. Hearn and copies of Plaintiff's prison medical records.

**Declaratory and Injunctive Claims**

Plaintiff was transferred from David Wade to Dixon Correctional Institute after he filed this suit.  Doc. 75. A prisoner's transfer to another facility "render[s] his claims for declaratory and injunctive relief moot."  Herman v. Holiday, 238 F.3d 660, 665 (5th Cir. 2001) (claims for injunctive and declaratory relief based on exposure to asbestos were mooted by transfer to another prison).  See also Cooper v. Sheriff, Lubbock County, 929 F.2d 1078, 1084 (5th Cir. 1991) (claims for injunctive relief based on denial of food at prior jail

were moot).  A claim for injunctive relief based on the possibility that a prisoner might someday be returned to the original prison has been characterized as "too speculative to warrant relief." Herman, 238 F.3d at 665.

Plaintiff declares that an official with the Department of Corrections threatened him that he would be returned to David Wade if this case goes to trial.  That might arguably defeat mootness, considering that Plaintiff reportedly has two years left to serve, but Plaintiff apparently agrees with Defendants' admission that the cats and the cathouse were removed in February 2007.  Under these circumstances, claims for injunctive or declaratory relief are moot, and the focus is solely on whether Plaintiff is entitled to damages.

**Damages Claims**

It was noted in the earlier Report and Recommendation that the Eighth Amendment requires that inmates be furnished with basic human needs, one of which is "reasonable safety." Helling v. McKinney, 113 S.Ct. 2475, 2480-81 (1993).  An inmate faced with unsafe conditions need not await a tragic event to have a claim.  Inmates may be entitled to relief if they prove the threats to personal safety from conditions such as exposed electrical wiring, deficient fire-fighting measures, the mingling of inmates with serious contagious diseases with other inmates, or exposure to unreasonably high levels of tobacco smoke.  If the conditions establish deliberate indifference to serious health problems, they may be actionable. Id.

But Plaintiff no longer faces the unsafe conditions about which he complained in his complaint.  We are no longer concerned about claims, for injunctive relief or otherwise, based on fears for future health and safety because of the presence of cats in the N5 compound.  Neither Plaintiff nor the cats are any longer present in N5.  There is also no basis to explore liability associated with what Plaintiff alleges were unsanitary conditions related to the cat being present in the living and dining areas.  Plaintiff apparently weathered those conditions with no serious damage to his health.  Plaintiff declares that the smell and hair made him nauseous at times, but there is no evidence of a related, serious medical condition that would trigger the Eighth Amendment's ban on "cruel and unusual punishments" and require a jury trial (demanded by Defendants) to resolve.

This case is now focused on whether prison officials are liable for damages related to the March 2006 incident with Kitty-Kitty.  The claim is most appropriately analyzed under the "deliberate indifference to a serious medical need" standard of Estelle v. Gamble, 97 S.Ct. 285, 291 (1976) (addressing medical care claim) and the similar "deliberate indifference to a substantial risk of serious harm" standard applied in Farmer v. Brennan, 114 S.Ct. 1970 (1994) (addressing failure to protect from fellow-inmate attack).  Both standards are employed to determine whether a prison official violated the Eighth Amendment prohibition on inflicting "cruel and unusual punishments."

In the medical context, deliberate indifference encompasses only unnecessary and wanton infliction of pain repugnant to the conscience of mankind. Estelle, 97 S.Ct. at 291-92.

In a failure to protect setting, the Court stated that in order for a prison official to act with deliberate indifference, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 114 S.Ct. at 1979.  "[D]eliberate indifference describes a state of mind more blameworthy than negligence" but "something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." 114 S.Ct.  at 1978.  It is a state of mind equated with the subjective recklessness standard defined by criminal law. Id. at 1979.

Plaintiff's evidence shows that he suffered relatively minor injuries when he was scratched by the cat in 2004.  Plaintiff then "personally informed" each Defendant that inmates were sheltering and feeding a cat inside of his housing unit.  Plaintiff has also shown that he wrote some letters that mentioned that he had been "attacked" by one of the cats, but the letters did not describe any resulting physical injuries or suggest that serious physical harm resulted from the attack.  Plaintiff did express fear of rabies or other diseases that a cat might transmit, but Defendants have offered uncontested evidence that Plaintiff was never affected by those diseases nor were there any known outbreak of those diseases in the area surrounding the prison.

The question, therefore, is whether prison officials were deliberately indifferent to a substantial risk of serious harm when, after being advised that Kitty-Kitty had committed an unspecified "attack" on Plaintiff in 2004, they did not remove the cats from the prison in time

to avoid Kitty-Kitty's run in with Plaintiff in 2006. Even if it is assumed – and there is no evidence to that effect – that Defendants were made aware of Plaintiff's claim that he suffered two lacerations and "significant bleeding" in the 2004 attack, Defendants' conduct is at most, negligence.[2] If a homeowner owns a cat that scratches someone and, two years later, the cat again scratches the person, the homeowner might be liable in negligence under tort law for the second incident, but Section 1983 does not provide a remedy for mere negligence. <u>Daniels v. Williams</u>, 106 S.Ct. 662 (1986) (prison official not liable under Section 1983 for negligence that caused slip and fall). It requires a constitutional violation under the standards discussed above. Plaintiff has not created a genuine issue of material fact as to whether any Defendant committed a constitutional violation under the applicable Eighth Amendment standards.

Accordingly;

**IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment (Doc. 76) be **denied**, that Defendants' Motion for Summary Judgment (Doc. 84) be **granted**, and that all of Plaintiff's claims in this civil action be **dismissed with prejudice**.

### Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this report and

---

[2]Inmate Arlen Brown testified that he had seen Kitty-Kitty attack or claw six inmates, including himself, but Plaintiff presented no evidence that any Defendant was made aware of those alleged attacks.

recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b).  A party may respond to another party's objections within ten (10) days after being served with a copy thereof.  Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 10 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 25th day of April, 2008.

MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE